IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                                        CR 13-2460 RB

JESUS CORONADO,

       Defendant.

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION REGARDING DEFENDANT'S MOTION TO SUPPRESS**

Defendant Jesus Coronado has been charged with violating 18 U.S.C. §§ 922(g)(1) and 924(a)(2), which prohibit felons from possessing firearms and ammunition in or affecting interstate or foreign commerce. (Doc. 17.) Coronado filed a Motion to Suppress certain evidence on August 9, 2013 (Doc. 21), and the Government filed a response on August 23, 2013 (Doc. 25). I held a hearing on the motion on November 21, 2013, at which time I admitted evidence and heard testimony from several witnesses. Having fully considered the pleadings, the testimony, and the facts and evidence before me, I recommend that the Court deny Coronado's Motion to Suppress in full.

**PROPOSED FINDINGS OF FACT**

Federal Rule of Criminal Procedure 12(d) provides that when factual issues are involved in deciding a motion, the Court must state its essential findings on the record. Based on the evidence presented at the suppression hearing, including exhibits and witness testimony, I propose the following factual findings:

1.  On the morning of October 26, 2011, a home burglary took place at 324 Pajaro Road in Las Cruces, Doña Ana County, New Mexico. A relative of the victim contacted the Doña Ana Sheriff's Office ("DASO") to report that she was following several suspected burglars, who were traveling in a white Chevrolet Malibu.

2.  Based on the license plate provided to them, DASO officers determined that the white Malibu was registered to a Monica Sanchez residing at 465 Linda Vista Road in Las Cruces. Overhearing this information on the police radio, DASO Investigator Lindell Wright and his partner drove to a location near that address and observed that residence until they were relieved by DASO Deputy Dason Allen shortly thereafter.

3.  Deputy Allen, who was working in an undercover capacity from his unmarked car, saw Coronado arrive at the house at 465 Linda Vista Road in a blue Ford Contour at approximately 12:20 p.m. Coronado exited the car, looked into its trunk, shut the trunk, then entered the house for approximately three minutes. While inside, Coronado repeatedly opened the curtain windows facing the street as if looking for something. When Coronado returned outside, he again looked into the car's trunk, then shut the trunk and drove off in the Contour.

4.  Deputy Allen continued to watch the Linda Vista house. A minute or two after Coronado left, Deputy Allen saw a green passenger vehicle occupied by two females park at that address. The women entered the residence briefly, then returned to the vehicle and left. Deputy Allen followed the vehicle east along Linda Vista.

5.  When the green vehicle approached the intersection of Linda Vista and Alameda Road, Deputy Allen saw the blue Contour traveling south on Alameda. The green vehicle turned south on Alameda as well, and both vehicles then turned west onto Palmer Road.

6. Deputy Allen saw the blue Contour conduct a U-turn on Palmer, and the vehicles pulled up next to each other in the middle of the road. Although Deputy Allen believed that both vehicles were engaged in illegal stopping, standing, or parking, he did not approach because he was working undercover. The occupants spoke to each other from inside their respective vehicles for a short while. Afterwards, the green vehicle pulled behind the blue Contour, and both cars returned to Alameda, with Deputy Allen following. The vehicles turned north on Alameda, then eventually turned east on Madrid Avenue.

7. As Deputy Allen followed the cars, he radioed a request for a uniformed deputy to stop and identify both vehicles and their occupants. After the cars turned east on Madrid, DASO Deputy Garth Pirtle turned on his emergency lights and pulled over the green vehicle into the parking lot of an apartment complex at 202 West Madrid Avenue. Deputy Allen ended his involvement with the vehicles at that point.

8. As he pulled into the parking lot, Deputy Pirtle overheard a description of the blue Contour over his police radio, and he noticed that the blue Contour had also pulled into the parking lot. Deputy Pirtle then approached the green car and spoke with its driver briefly.

9. As other deputies arrived, Deputy Pirtle saw Coronado exit the blue Contour and walk toward the apartments. Deputy Pirtle followed Coronado and called out a request to speak with him. Coronado looked at Deputy Pirtle but kept walking around the back of the apartment. Deputy Pirtle then approached more quickly and again asked Coronado to speak with him, at which point Coronado turned around and walked with Deputy Pirtle. When Coronado asked what was going on, Deputy Pirtle said that he was asked to identify Coronado and that other deputies "will talk to you about whatever they need to talk to you about."

10. At the deputies' instruction, Coronado sat in front of the apartment complex on a curb at least ten or twenty feet away from the blue Contour. DASO Deputy Donald Frank, who had learned from Deputy Allen that Coronado had been driving one of the vehicles that had been followed, spoke to Coronado and obtained his name. Coronado did not have any identification on him, and Deputy Frank was unable to confirm any information about him through his dispatch.

11. Deputy Frank, a former corrections officer, eventually recognized Coronado as a former inmate and remembered his alias. Using that information, Deputy Frank contacted dispatch to check Coronado's information against DASO's records.

12. Dispatch reported that Coronado had a revoked driver's license with an "arrest clause," meaning an instruction to arrest him and immediately take him before a magistrate pursuant to N.M. STAT. ANN. § 66-8-122(G)[1] for any motor vehicle offense. (*See* Gov't. Ex. 2 at 1.)

13. Coronado was immediately arrested for driving with a revoked driver's license.

14. DASO maintains a policy allowing it to impound a vehicle when the vehicle's driver is arrested or when the driver is found to have no driver's license. (Doc. 25 Ex. A.) The same policy mandates that an inventory be conducted as to the belongings in the vehicle to ensure that the vehicle and the objects inside are not damaged while the vehicle is in the towing company's custody. (*See id.*) The policy prohibits deputies from releasing the vehicle to family or friends upon the driver's arrest. (*Id.*)

---

[1] N.M. STAT. ANN. § 66-8-122(G) provides authority for such an arrest when a driver's license has been revoked due to a conviction for driving while under the influence of intoxicating liquor or drugs. Coronado's license had been revoked for this reason. (*See* Gov't. Ex. 2 at 1.) Normally, a driver observed committing a traffic violation would otherwise be released from custody following the issuance of a citation. *See* N.M. STAT. ANN. § 66-8-123(A)-(B).

In his motion, Coronado states, "[b]ased on information and belief," that his driving record did not contain such an arrest clause at the time of his arrest. (Doc. 21 at 4.) The Government, relying on Government Exhibit 2 and testimony from Deputy Frank, argued at the hearing that Coronado's record did feature an arrest clause at the time of his arrest, and Coronado no longer appears to contest this point.

15. Deputy Frank conducted an inventory of the blue Contour pursuant to DASO policy. In the trunk of the car were a distinctive brown gun case, a 12-gauge shotgun, a camera bag, and a red and black laptop. These items appeared to match objects reported as stolen from a residence on Tellbrook Avenue in Las Cruces on October 20, 2011, a burglary that Deputy Frank had responded to.

16. Coronado was moved to the main DASO station, the items found in the car trunk were taken into evidence, and the Contour was towed.

17. Investigator Wright, who had also investigated the October 20 burglary, confirmed that the shotgun taken into evidence was tied to that burglary. He also confirmed that the owner of the white Malibu, Monica Sanchez, had been at work during the burglary that morning.

18. At 1:51 p.m., Investigator Wright and his partner read Coronado his *Miranda* rights, *see Miranda v. Arizona*, 384 U.S. 436 (1966), and spoke with him in an interview room at the DASO station (Gov't Ex. 5 at 1). The investigators were in plain clothes and were both wearing their badges and firearms. Coronado waived his *Miranda* rights and spoke to the investigators for about seventeen minutes. (*Id.*) Coronado denied any involvement in criminal activity at that time. (*Id.*)

19. Investigator Wright and his partner spoke with Coronado again at 5:07 p.m. that evening. (Gov't Ex. 6 at 1.) Investigator Wright reminded Coronado of his *Miranda* rights and that he could stop talking with them at any time. (*Id.*) Coronado continued to deny any involvement in criminal activity. (*Id.*) At 5:15 p.m., investigators concluded the interview at Coronado's apparent request. (*See id.* at 8.)

20. Shortly after Investigator Wright left the interview, Coronado asked to speak to him again, at which time he asked to "work with" DASO in an informant capacity. Investigator

Wright informed Coronado that DASO did not have the resources to work with him but that he would forward his request to an ATF agent.

21. Investigator Wright spoke to an ATF agent, and on the morning of October 27, 2011, two agents arrived at the detention center where Coronado was being held. The agents were wearing plain clothes and were not wearing visible firearms.

22. The ATF agents Mirandized Coronado using an ATF "Advice of Rights and Waiver" form, which listed the rights afforded to suspects under *Miranda* and which included a waiver provision. (*See* Gov't Ex. 3.) Coronado signed the waiver. (*Id.*)

23. During his interview with the agents, Coronado wrote down his statement on a form marked "affidavit,"[2] which he then signed. (*See* Gov't Ex. 4.)

24. At the end of the interview, ATF agents determined that they would use Coronado as a confidential informant. At the agents' request, DASO released Coronado and did not file any charges relating to the burglaries.

25. Coronado cooperated as a confidential informant with the ATF for approximately ten months. At the end of that period, ATF agents concluded that Coronado had engaged in illegal activity that was not allowed while working as an ATF informant, and the ATF terminated its arrangement with Coronado.

## LEGAL STANDARDS AND ANALYSIS

Coronado moves to suppress the fruits of the inventory search conducted on October 26, 2011, and the statements obtained by ATF agents on October 27, 2011. (Doc. 21.) In support, Coronado argues that he was illegally seized, that the blue Contour was illegally impounded and searched, and that his statements were involuntary and were obtained as fruits of his illegal

---

[2] Despite the form's title, Coronado's statement was not sworn under penalty of perjury.

search and seizure. The Government responds that Coronado's seizure and the search of the vehicle were lawful and that his statements were voluntarily given.

## I. Seizure of Coronado

The Fourth Amendment protects citizens from "unreasonable searches and seizures" by government officials. U.S. CONST. amend IV; *see, e.g.*, *United States v. Burleson*, 657 F.3d 1040, 1044-45 (10th Cir. 2011). The burden of proving that a seizure is reasonable lies with the Government, *see United States v. De La Cruz*, 703 F.3d 1193, 1196 (10th Cir. 2013) (citation omitted), though ultimately "the burden is on the defendant to prove that the challenged seizure was illegal," *United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004).

### *A. Investigatory Detention*

At the outset, it is apparent that Coronado was seized when he was detained by deputies for identification purposes. "When an officer does not apply physical force to restrain a suspect, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submit[s] to the assertion of authority.'" *See United States v. Salazar*, 609 F.3d 1059, 1064 (10th Cir. 2010) (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). Here, the deputies never applied physical force to Coronado prior to his arrest. It is also true that Coronado ignored Deputy Pirtle's first request to talk and continued to move away from him, indicating a belief that he was free to continue walking away. *Cf. Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (citation omitted). However, Deputy Pirtle's persistence in following Coronado and asking him to come and speak with him, accompanied by his statement that "these guys over here [i.e. the other deputies] *will* talk to you about whatever they need to talk to you about" (emphasis added), "would have conveyed . . . to a reasonable person" that he was being "ordered to restrict his movement." *See Salazar*, 609 F.3d at 1064. Moreover, it is undisputed that Coronado was

7

compliant with all of Deputy Pirtle's subsequent requests, indicating that he submitted to the deputy's show of authority. *See id.* (citing *Hodari D.*, 499 U.S. at 628); *cf. United States v. Morgan*, 936 F.2d 1561, 1567 (10th Cir. 1991) (finding a seizure where the defendant was followed by a uniformed police officer in a marked car, was asked to "hold up," and "yielded" by asking what the officer wanted). From the moment of his submission to Deputy Pirtle's requests, then, Coronado was seized for Fourth Amendment purposes.

I also recognize that the seizure of Coronado prior to his arrest was brief, nonintrusive, and conducted for the purpose of "investigating possibly criminal behavior," making it an investigatory detention governed by *Terry v. Ohio*. *See* 392 U.S. 1, 22 (1968). Accordingly, the detention was only reasonable if it was justified by a reasonable articulable suspicion that Coronado had committed or was about to commit a crime. *See De La Cruz*, 703 F.3d at 1196 (citing *Florida v. Royer*, 460 U.S. 491, 498 (1983)). Reasonable suspicion is "something more than an inchoate and unparticularized suspicion or hunch," but it "is considerably less than proof by a preponderance of the evidence or that required for probable cause." *United States v. Chavez*, 660 F.3d 1215, 1221 (10th Cir. 2011) (citation omitted). Reasonable suspicion is measured by the totality of the circumstances, using an objective standard; the detaining officer's subjective beliefs and intentions are irrelevant. *See id.* at 1221-22 (citation omitted).

In the Tenth Circuit, the reasonableness of an investigative detention is examined under a two-step inquiry. *Lundstrom v. Romero*, 616 F.3d 1108, 1120 (10th Cir. 2010). First, a court must assess whether the detention was justified at its inception. *Id.* (citation omitted). If the initial suspicion dissipates at some point, a court must determine whether any "additional detention [wa]s supported by [new] reasonable suspicion of criminal activity," provided that reasonable suspicion existed at all stages of the detention. *De La Cruz*, 703 F.3d at 1198 (citation

omitted). Second, the court must evaluate whether the officer's actions were reasonably related in scope to the circumstances that justified the detention. *Lundstrom*, 616 F.3d at 1120 (citation omitted).

The Government argues that Coronado's investigatory detention for identification purposes was reasonable because Deputy Allen had witnessed Coronado committing a traffic violation. Deputy Allen testified that he had observed Coronado and the green vehicle parked in the middle of the roadway on Palmer Road, and he opined that this activity constituted illegal "stop/standing/parking." Indeed, N.M. STAT. ANN. § 66-7-351(A)(11) prohibits stopping, standing, or parking a vehicle "alongside or opposite any . . . obstruction when [that activity] would obstruct traffic." A reasonable officer observing two cars parked next to each other in the middle of a residential roadway could likely conclude that the vehicles would obstruct traffic. Thus, Deputy Allen's observations provided him with at least the reasonable suspicion necessary to instigate a traffic stop, which would be analogous to an investigatory detention and also governed by *Terry*. *See United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1226 (10th Cir. 2008); *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995). Additionally, the deputies' actions prior to the arrest, aimed solely at identifying Coronado after an observed motor vehicle violation, were reasonably related in scope to that violation. *See United States v. McSwain*, 29 F.3d 558, 561 (10th Cir. 1994) (citations omitted).

Coronado attacks these conclusions on two grounds. First, he contends that the traffic violation constituted pretext for the detention and that the deputies were really looking for information regarding that morning's burglary. However, an officer's subjective motives for stopping a driver are irrelevant; an observed traffic violation provides objective justification for an investigatory detention. *See Botero-Ospina*, 71 F.3d at 787.

Coronado also challenges whether any detention by Deputy Pirtle or Deputy Frank was justified since neither person observed the traffic violation or possessed any reasonable suspicion that wrongdoing had occurred. This challenge is undermined by the vertical collective knowledge doctrine, which holds that "an officer with reasonable suspicion may instruct another officer to make a *Terry* stop without communicating the basis for the stop, so long as the communicating officer has reasonable suspicion to make the stop himself." *United States v. Whitley*, 680 F.3d 1227, 1234 (10th Cir. 2012) (citing *United States v. Chavez*, 534 F.3d 1338, 1347-48 (10th Cir. 2008)). Because Deputy Allen observed Coronado's traffic violation and instructed other deputies, including Deputy Pirtle and Deputy Frank, to stop and identify him, Deputy Allen's knowledge and reasonable suspicions are imputed to the latter two deputies. *See id.*

In summary, the deputies here possessed a reasonable articulable suspicion that Coronado had committed a traffic violation, and their attempts to verify his identity were reasonably related in scope to this violation. Their investigatory detention of Coronado was therefore permissible on this ground. Accordingly, I do not reach the Government's argument that the detention was also justified by Deputy Allen's suspicions regarding the October 26 burglary.

  *B. Arrest*

The Fourth Amendment requires that an arrest be supported by probable cause. U.S. CONST. amend IV. "Probable cause is measured against an objective standard"; the fulcrum issue is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." *United States v. Soto*, 375 F.3d 1219, 1222 (10th Cir. 2004) (citation omitted). A court will find that probable cause supported a defendant's arrest when the reasonably trustworthy facts and circumstances known

to the officer would cause a reasonable man to believe that the defendant has committed or is committing an offense. *See Morgan*, 936 F.2d at 1568 (citations omitted).

Here, a lawful background check and communication with the dispatcher confirmed that Coronado's license had been revoked and that his driving record featured an arrest clause, which instructed officers to arrest him pursuant to N.M. STAT. ANN. § 66-8-122(G) following any traffic violation. (*See* Gov't Ex. 2.) Deputy Frank had learned from Deputy Allen that Coronado had been driving, and he was entitled to rely upon that information in reaching a probable cause determination under the collective knowledge doctrine discussed above. *See Koch v. City of Del City*, 660 F.3d 1228, 1240 (10th Cir. 2011) (citation omitted). Given that information and his knowledge of the arrest clause, Deputy Frank possessed probable cause to arrest Coronado for driving on a suspended license. *See* N.M. STAT. ANN. § 66-5-39.1(A) (defining "[d]riving while license revoked" as a misdemeanor). The deputies' seizure of Coronado was therefore valid at all times, and thus I recommend that the Court deny Coronado's motion to suppress on illegal-seizure grounds.

## II.     Vehicle Impoundment and Inventory

Coronado also argues that the warrantless impoundment and search of the blue Contour were unconstitutional. The Fourth Amendment permits warrantless inventory searches of vehicles that are lawfully impounded by police under the "community caretaking" doctrine. *See South Dakota v. Opperman*, 428 U.S. 364, 368-76 (1976). These searches may extend to locked car trunks. *See, e.g.*, *United States v. Tueller*, 349 F.3d 1239, 1244 (10th Cir. 2003) (citing *United States v. Martin*, 566 F.2d 1143 (10th Cir. 1977)). Three purposes underlie the permissibility of inventory searches: "protection of the owner's property, protection of the police against claims of lost or stolen property, and protection of the police from potential danger."

11

*United States v. Haro-Salcedo*, 107 F.3d 769, 772 (10th Cir. 1997) (citation omitted). However, such searches must be justified by administrative purposes, must follow "standardized criteria or established routine," and "must not be a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990) (internal citations omitted).

Before examining the reasonableness of the inventory search itself, I first address the reasonableness of the impoundment. *See United States v. Kornegay*, 885 F.2d 713, 716 (10th Cir. 1989). DASO policy holds that a deputy may impound a vehicle if the driver is placed in custodial arrest or if the driver has no driver's license. (Doc. 25 Ex. A.) Coronado argues that the policy could not apply to him because he was only a *suspected* driver at the time of his arrest, and the policy only calls for impoundment when "the driver" is arrested. I see no need to dwell on this argument. It is undisputed that Coronado was driving the blue Contour when he committed the alleged traffic violation, and it is enough that Deputy Allen relayed this fact to Deputy Frank prior to Coronado's arrest and the vehicle's impoundment.

Coronado also contends that the execution of the impound policy cannot be justified under the community caretaker doctrine, since he was not arrested while in the blue Contour or particularly close to it; the car was parked in a private parking lot, with no indication that it was parked in a hazardous or illegal manner; and no one associated with the property had requested the vehicle's removal. In *Kornegay*, FBI agents arrested a man who had been observed entering an auction building and selling stolen tractors under an assumed name. *See* 885 F.2d at 715. As he was escorted from the building, he identified his vehicle, and the agents impounded it and conducted an inventory search. *See id.* The Tenth Circuit concluded that the vehicle had been properly impounded under the community caretaker doctrine for several reasons—the agents did not know the defendant's true name, his place of residence, or where the vehicle had come from;

12

he was alone, with no companion who could be asked to care for the car; agents had every reason to believe he would be unavailable for the foreseeable future due to his arrest; and police had valid concerns that the vehicle could be at risk for vandalism or theft if left in a lot open to the public. *See id.* at 716. Indeed, the fact that the car was properly parked in a private lot, rather than on a public roadway, did not render the impoundment unnecessary due to these concerns. *See id.*

Although there are some differences between *Kornegay* and the instant case, the balance of these factors suggests that the impoundment here was justified under the community caretaker doctrine. As in *Kornegay*, Coronado was not traveling with a companion, and the police were not required to allow him a chance to make arrangements for someone else to pick the vehicle up. *See, e.g.*, *United States v. Andas-Gallardo*, 3 F. App'x 959, 963 (10th Cir. 2001) (unpublished) (citing *Colorado v. Bertine*, 479 U.S. 367, 374 (1987)). The deputies' lawful arrest of Coronado gave them reason to believe that he would not return to the vehicle for some time, and even if he could, he would have been unable to lawfully drive the vehicle away while his license remained revoked. Further, although the vehicle was parked on private property, that property did not belong to Coronado, and there was no evidence that the vehicle would remain safe if left there. *Cf. id.*

While Coronado cites to contrary authority, I find the facts here to be distinguishable from those cases. Despite his citation to *United States v. Ibarra*, where impoundment was found to be unreasonable, the defendant there was not under arrest at the time of impoundment as required by statute, the situation did not meet other statutory requirements, and the district court found the arresting officers' rationale for the impoundment to be incredible. *Cf.* 955 F.2d 1405, 1408-10 (10th Cir. 1992). Coronado's reliance on *United States v. Pappas* is similarly misplaced,

as the defendant there was traveling with a companion who could have driven the vehicle herself or who could have asked one of several nearby friends to look after it. *Cf.* 735 F.2d 1232, 1233-34 (10th Cir. 1984). While the facts here differ from each of the cited cases in several ways, I find them to be more analogous to the situation in *Kornegay* than that in either *Ibarra* or *Pappas*. Given the factors discussed above, the deputies were justified in impounding Coronado's vehicle under the community caretaker exception.

Coronado next argues that rather than being administratively justified, the deputies' motives for the impoundment and inventory were purely investigatory. Although Deputy Allen testified that he had notified dispatch via radio of his suspicions regarding Coronado's connection to the burglary, Deputy Frank did not testify to his knowledge of this information. However, even if he were fully aware of these circumstances, "an inventory search is not rendered unconstitutional simply because it also had an investigatory purpose, provided that is not the sole purpose." *United States v. Moraga*, 76 F. App'x 223, 228 (10th Cir. 2003) (unpublished) (citing *United States v. Frank*, 864 F.2d 992, 1001 (3d Cir. 1988)). Deputy Frank testified that the inventory was conducted prior to towing the vehicle in order to ensure that the vehicle and its contents were not damaged while in the towing company's custody. This credible testimony supports the conclusion that the inventory was conducted with regulatory concerns in mind and justified by administrative purposes, whether or not Deputy Frank also possessed other motives.

Having established that the vehicle was lawfully impounded and that the search was administratively justified and not merely a pretext concealing an investigatory motive, all that is left is to determine whether the inventory was conducted pursuant to standardized criteria or established routine. *See Wells*, 495 U.S. at 4. Coronado does not challenge this factor, and

Deputy Frank credibly testified that the inventory followed DASO policy, which he said is followed whenever an arrest of this sort occurs. Therefore, I find this factor to be satisfied and that the impoundment and inventory of the blue Contour were proper, and I recommend that the Court deny Coronado's motion to suppress on this basis.

### III.     Interrogation

Finally, Coronado challenges the admissibility of the inculpatory statements provided to the ATF agents on October 27, 2011. At the hearing, Coronado contended that the statements must be considered the "fruit of the poisonous tree" in light of the illegal nature of the inventory search. Because the inventory was lawfully conducted, I find this argument to be without merit.

In his motion, Coronado argues that he was not read his *Miranda* rights prior to giving his written statement to the ATF agents. (Doc. 21 at 8.) At the hearing, the Government introduced an Advice of Rights and Waiver form signed by Coronado on the date of the interrogation. (Gov't Ex. 3.) That form lists a suspect's rights under *Miranda*, and Coronado's signature below the "waiver" portion of the document indicates that he was aware of these rights, that he understood them, and that he was willing to answer questions without a lawyer present. (*Id.*) The interviewing ATF agent testified at the hearing that Coronado appeared to understand his requests and questions and that Coronado never indicated during the interview session that he no longer wanted to speak with the agent or that he wanted an attorney. I find this uncontroverted evidence credible, and I conclude that Coronado was told of his *Miranda* rights before the ATF agents took his statement.

Coronado also argues in his motion that his statements constitute an involuntary confession. (Doc. 21 at 8.) The question of whether a confession is voluntary under due process jurisprudence is distinct from whether the accused has properly been informed of his *Miranda*

rights. *See, e.g.*, *United States v. Lopez*, 437 F.3d 1059, 1065-66 (10th Cir. 2006); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 224-25 (1973). The voluntariness of a confession is determined under a totality-of-the-circumstances analysis, considering "both the characteristics of the accused and the details of the interrogation." *Lopez*, 437 F.3d at 1063 (quoting *United States v. Lugo*, 170 F.3d 996, 1004 (10th Cir. 1999)). These factors include "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment." *Id.* at 1063-64 (quoting *United States v. Toles*, 297 F.3d 959, 965-66 (10th Cir. 2002)). The Government bears the burden of showing the voluntariness of a confession by a preponderance of the evidence. *E.g. United States v. McCullah*, 76 F.3d 1087, 1100 (10th Cir. 1996) (citation omitted).

Investigator Wright's testimony establishes that the October 27 interrogation was conducted by ATF agents at Coronado's request. Coronado is an adult, and none of the evidence or testimony indicates that he is limited in intelligence or education. *Cf. id.* at 1065 (citing *Toles*, 297 F.3d at 966). He was advised of his constitutional rights prior to the interrogation in question, and there is no evidence that he was subjected to physical punishment before that time. By the close of the interview, Coronado had been detained for almost twenty-four hours, but he had requested an opportunity to work with authorities only four or five hours into his detention. Further, the Advice of Rights and Waiver form was signed at 9:40 a.m. on October 27, 2011 (*see* Gov't Ex. 3), and Coronado had finished writing his statement by 11:25 a.m. (*see* Gov't Ex. 4 at 1), suggesting a relatively brief questioning period. These factors, taken as a whole, establish that Coronado's statement was voluntary.

Coronado also points to factors listed in 18 U.S.C. § 3501(b) to suggest the involuntariness of his confession. (Doc. 21 at 8.) That provision was declared unconstitutional in 2000, *see Dickerson v. United States*, 530 U.S. 428, 444 (2000), and district courts rarely use these factors for guidance. Nonetheless, even these factors do not substantially alter my analysis. Although Coronado had not spoken to counsel, he was aware of and had waived his *Miranda* rights. (Gov't Ex. 3.) Further, transcripts of the previous day's interrogations demonstrate that Coronado was aware of the general nature of the offense with which he was to be charged. (*See* Gov't Ex. 6 at 2-3.) Thus, under the totality of the circumstances, I find that Coronado's statement was "the product of an essentially free and unconstrained choice by its maker," *United States v. Perdue*, 8 F.3d 1455, 1466 (10th Cir. 1993) (citation omitted), and I recommend that the Court deny his motion to suppress his statement to the ATF agents.

## CONCLUSION

The Government has established that the seizure of Coronado and the impoundment and inventory of the blue Contour were lawful and that his statements to the ATF agents were voluntary. As such, I recommend that the Court deny Coronado's motion to suppress.

> **THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

*William P. Lynch*
William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.